United States District Court
Southern District of Texas
**ENTERED**
April 29, 2016
David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF TEXAS**

**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DIAMOND BEACH VP, LP | § | Case No. 1:14-cv-00046 |
| Debtor. | § | |
| ——————————————— | §——————————————————— | |
| | § | |
| | § | Adversary Proceeding No. 12-01006 |
| RANDALL J. DAVIS, | § | |
| Appellant, | § | |
| v. | § | |
| | § | |
| INTERNATIONAL BANK OF | § | |
| COMMERCE, | § | |
| Appellee. | § | |
| ——————————————— | § | |

**MEMORANDUM OPINION AND ORDER**

This case concerns a dispute over the valuation of an unfinished condominium complex. The immediate purpose of the valuation is to determine the amount of a deficiency judgment. Appellant, Randall Davis (hereinafter referred to as "Davis," or "Appellant"), is appealing a judgment of the United States Bankruptcy Court for the Southern District of Texas. The judgment, in Davis' opinion, values the unfinished complex (hereinafter, the "Project," or "Diamond Beach") too low—thereby increasing the amount of the deficiency judgment Davis must pay International Bank of Commerce (hereinafter, "IBC," the "Bank," or "Appellee").

I.      **Facts and History of the Case**

The project, known as Diamond Beach VP, LP (hereinafter, "Diamond Beach"), was designed to be a luxury condominium project in Galveston, Texas.  Diamond Beach was to be built in two phases. IBC financed the land and construction costs for the project. Davis, Diamond Beach's principal owner, guaranteed, in part, the debt to IBC. Construction on Phase I began pursuant to a construction loan agreement Davis and the Bank signed in September 2006. For various reasons, including the devastation wrought by Hurricane Ike in September 2008 on the Galveston real estate market and the Galveston mortgage market, Diamond Beach encountered difficulties selling its condominiums. As a result, Diamond Beach found itself unable to repay the Bank. It ultimately filed for bankruptcy in 2012. Though Phase I was ultimately completed, construction of Phase II never began.[1]

Various forms of intrigue attended Diamond Beach's descent into bankruptcy. Davis alleged that a Bank employee threatened to ruin his development career. The Bank also brought a state court lawsuit against Davis. The suit alleged, in part, that Davis attempted to defraud the Bank by siphoning money into limited partnerships and family annuities. The Bank dismissed this suit two weeks after filing it.  The Bankruptcy Court stated that Davis has not been able to obtain financing since the substance of the state lawsuit made it into the Houston Chronicle. These episodes, however, do not bear directly on the appeal at bar. The Court notes them only because the Bankruptcy Court stated such events would lead it to view skeptically the testimony of IBC's agents and witnesses.

---

[1] The Declaration of Diamond Beach Condominiums called for 117 units to be constructed in Phase I but only 116 were built. [3d Amendment To Decl. of Diamond Beach Condominiums, Pl.'s Ex. 111, Doc. No. 28-138, Art. II]; [Decl. of Diamond Beach Condominiums, Pl.'s Ex. 108, Doc. No. 28-135, Art. V §5.1]; *In re Diamond Beach VP, LP*, 506 B.R. 701, 704 (Bankr. S.D. Tex. 2014).

In April 2012, Diamond Beach filed a voluntary Chapter 11 petition for bankruptcy. *In re Diamond Beach VP, LP*, 506 B.R. 701, 706 (Bankr. S.D. Tex. 2014). The Bankruptcy Court subsequently confirmed the Chapter 11 plan. *Id*. Diamond Beach ultimately negotiated a settlement agreement with IBC, which allowed IBC's prepetition claim in the amount of $28,193,759.32.[2] *Id*. Per the settlement's terms, in June 2012 IBC was also allowed to foreclose on Diamond Beach. *Id*.

The settlement provided that the Bankruptcy Court would determine the value of the Diamond Beach Property. *Id*. It further determined that the IBC deficiency judgment would equal the difference between the Bankruptcy Court's valuation and the agreed-to prepetition claim. *Id*. The deficiency would be an allowed unsecured claim and would be paid by Davis due to his guarantees.[3] *Id*. Thus, the higher the Bankruptcy Court valued Diamond Beach, the less Davis would owe the Bank in deficiency judgment; the lower the Bankruptcy Court valued Diamond Beach, the more Davis would owe the Bank.

The particular contours of this appeal derive from the project's peculiar structure when it finally reached the Bankruptcy Court. The project's structure is laid out in the Declaration of Diamond Beach Condominiums and its subsequent amendments (hereinafter, the "Declaration"). These documents are somewhat ambiguous, and this resulted in multiple inconclusive interpretations during the trial. The project's peculiar structure also results from a transfer of the ownership of its completed amenities immediately preceding the bankruptcy filing and the fact

---

[2] After the settlement, this $28,193,759.32 prepetition claim was reduced, by agreement of the parties, to $27,578,592.89, subsequent to the sale of one of the Phase I units. *In re Diamond Beach*, 506 B.R. at 727 n.5.

[3] The settlement provided, specifically, that the claim would be paid as follows: up to $2,500,000.00 in cash from Randall Davis; up to $1,500,000.00 in cash from liquidation of annuities from Randall Davis; and up to $6,000,000.00 in an agreed judgment entered in the Bankruptcy Court's proceeding. *Id.*

that the project went bankrupt prior to completion. This transfer was a pivotal point discussed at oral argument in this Court.[4] [Tr. of Oral Arg., Doc. No. 30 at 32].

The Declaration envisioned a total of 240 luxury condominium units, 117 in the first phase (hereinafter, "Phase I") and 123 in the second phase (hereinafter, "Phase II").[5]  [Decl. of Diamond Beach Condominiums, Pl.'s Ex. 108, Doc. No. 28-135 Art. V §5.1]. Phase I and Phase II were to be constructed on separate, adjacent portions of the same piece of real property (hereinafter, the "Phase I land" and the "Phase II land"), their boundaries delineated by the Declaration. [Doc. No. 30; Doc. No. 28-135 Art. I §1.2]. A lavish array of recreational facilities known as the "common elements" (hereinafter, the "common elements," the "common amenities," or the "shared amenities") was to lie between both Phases and the Gulf of Mexico.

The Declaration envisaged a scheme for the common elements' governance, upkeep, use, and ownership. [Doc. No. 28-135 Art. VII §7.1, Art. IX §9]. Regardless of the original plan, the ultimate result was that, instead of both Phases owning the common amenities, Phase I owns the common elements by itself while Phase II merely possesses a right to use them.[6] [Doc. No. 30 at 28–30, 32–34]. Phase II is also burdened with the duty to pay for its percentage of the upkeep of

---

[4] Counsel for Appellee stated at oral argument that "[t]hat property [the Lazy River] is now owned by Phase I and the condominium owners under the deeds that they were – the condominium owners purchased. They own – this is important distinction [sic] Your Honor. The Phase One condominium owners own 100 percent of their condominium units and 100 percent of all common elements which the common elements include the pool, wet bar, grill cooker." [Tr. of Oral Arg., Doc. No. 30 at 32]. Appellant did not dispute and has not disputed this fact.

[5] Construction of Phase II was to start after completion of Phase I. [1st Am. To Decl. of Diamond Beach Condominiums, Pl.'s Ex. 109, Doc. No. 28-136 Art. II]. The Declaration provided that Phase II did not, necessarily, have to be built at all. [*Id.*].

[6] At oral argument, Appellee stated that "Phase One condominium owners own . . . 100 percent of all common elements." [Doc. No. 30 at 32]. Appellee further stated that the parties had "agree[d] that . . . [the] one issue [was] . . . [how to value] a right to use a neighbor's amenities constructed on Phase One."  [*Id.* at 33–34.]. Appellant did not dispute and has not disputed this fact.

the shared amenities. Phase II's right to use the common elements is the key for the purposes of this appeal, and it will be discussed in greater detail below.

The Declaration states that each Phase was to be constituted by the residential units and common elements that fell within that Phase's real property boundaries as delineated by the Declaration. [Doc. No. 28-135 Art. I §1.2]. The Declaration states that all units in both Phase I and Phase II have, "appurtenant to each unit," "an individual share" of the common elements. [*Id*. at Art. V §5.3].   Ultimately, the common elements were built on the real property delineated in the Declaration and its amendments as Phase I;[7] thus, for purposes of this appeal, the common elements are, as noted, owned by Phase I.[8] At oral argument before this Court the parties agreed that Phase II owns only a right to use the common elements. [Doc. No. 30 at 28, 30, 32–34]. The Court proceeds on this understanding of the ownership and right to use arrangement: Phase I owns the common elements and Phase II merely possesses a right to use them.[9]

---

[7] An exception to this was the Lazy River—but, as noted, the property on which it sits has now been transferred to Phase I.

[8] The parties state as much in their pleadings. Appellant in his brief states that the common elements "exist" on Phase I, except for the Lazy River, which is on Phase II. [Appellant's Reply Br., Doc. No. 15 at 17]. Appellee states in its pleadings that Phase I owns all the common elements. [Appellee's Sur-Reply, Doc. No. 17 at 6]. The Court notes oral argument cleared up this apparent contradiction, with counsel for Appellee stating that the land where one of the more prominent common elements—the Lazy River—sits was transferred to Phase I. [Doc. No. 30 at 32]. Counsel for Appellant did not dispute this. [*Id*.].

[9] Some disagreement exists among the parties as to whether the buyer of Phase II has the right to use the common elements only if Phase II is used to build condominiums or another comparable residential development. What kind of agreement would have to be reached by Phase II owners with Phase I owners to permit use of the common elements in the case of a non-condominium development being built on Phase II was never fleshed out.  As the Bankruptcy Court noted, "[t]here are no guidelines for what such an agreement might resemble" nor any "witness testi[mony] about the risks of obtaining [such] an agreement with the Phase I owners." *In re Diamond Beach*, 506 B.R. at 719.  The Bankruptcy Court further stated that "there is no evidence before the Court as to how the amenities could properly be valued for hotel [, i.e., non-condominium] use." *Id*.  As the Bankruptcy Court noted, as long as condominiums are built on Phase II, the Declaration controls. This was one of the reasons that the Bankruptcy Court declined to "attribute value to the Common Elements for a hotel" or any non-condominium

Before filing for Chapter 11 bankruptcy and ceasing work on Phase I, Diamond Beach had completed 116 of the Phase I units. Construction had not begun on Phase II, though Diamond Beach had obtained permits to construct 120 units on the Phase II land. Apart from the condominium units it had built, Diamond Beach had also completed the above referenced common elements and amenities on the Phase I land.

These common elements range from the grand to the ordinary. They include the largest resort pool in Texas (300 feet plus), a state-of-the-art fitness center, a large bar, a lazy river, a kids club, a video game room (utilizing a Wii), a heated indoor pool, a private wine bar, a game room, outdoor cabanas, and access to private beaches. They also include the shared entranceways, elevators, and walkways of which owners of both Phases would make regular use.[10]

To better convey Diamond Beach's unusual structure, the Court includes below a visual representation of Diamond Beach. This representation was not one admitted into evidence but was created by the Court, based on the trial evidence and the oral argument before this Court.

development. *Id.*  The trial record also contains a discussion of possible uses of Phase II for which the right to use and the concurrent obligation to pay for the maintenance of the shared amenities built on Phase I would be a liability. This would occur when the development of Phase II would not benefit from the right to use the common elements.  One example discussed would consist of non-condominium uses, such as a shopping center. [Tr. Bankruptcy Ct. Hr'g 5/13/13, Doc. No. 2-11 at 63].

[10] The different experts differed as to what constitutes a "common element"—for instance, whether an elevator to the top floor of Phase I is a common element when a unit owner in Phase II is unlikely to use it. The indoor common amenities are located inside the Phase I building.



## II.   The Bankruptcy Court's Decision

### A.  What the Bankruptcy Court Decided

The Bankruptcy Court found that Phase II's "highest and best use" was a speculative holding for future condominium development. This mirrored the conclusion of three of the four experts' trial testimony. [Aug. 2012 Report of Stephen Duplantis, Pl.'s Ex. 32, Doc. No. 28-32 at 53]; [Report of Mathew Deal, Def.'s Ex. 5A, Doc. No. 29-12 at 12–13]; [Report of Ronald Little, Pl.'s Ex. 54, Doc. No. 28-76 at 17]. The Bankruptcy Court set the total value of Phase II and the unsold Phase I condominium units at $21,533,898.51. *In re Diamond Beach*, 506 B.R. at 703. This resulted in a deficiency balance of $6,044,694.38, which presumably will be satisfied pursuant to the parties' settlement agreement. *Id.*

## B.  The Bankruptcy Court's Findings and Conclusions

As noted, Diamond Beach was and, for the most part, still is a half-finished condominium complex. One component (Phase I) is fully developed and consists of 116 completed condominium units. On this part sit the common elements. The other component (Phase II) is vacant land planned and zoned for 123 condominium units. Nothing sits on this part, neither condominium units nor common elements. To determine the amount of deficiency balance owed by Davis, the Bankruptcy Court had to value two aspects. The first was the forty-one condominium units on Phase I that, at the time of valuation, had not sold. The second was the value of the undeveloped Phase II land adjacent to the completed component of Diamond Beach (Phase I). This would necessarily include the value of the Phase II land by itself plus the value of the right to use the Phase I amenities which the owner of the Phase II land would possess.

The Bankruptcy Court valued the forty-one unsold Phase I condominium units at $14,600,000. *Id*. at 718. Appellant conceded the accuracy of this figure at oral argument. Appellant stated that "there's very little disagreement among the experts over [the value of the unsold Phase I units], and that's really not what we're here to argue about today." [Doc. No. 30 at 11].

The Bankruptcy Court valued the Phase II land plus the right to use the shared amenities at $6,933,898.51. *In re Diamond Beach*, 506 B.R. at 726, 727. To arrive at this figure the Bankruptcy Court calculated the likely sales price of a fully developed Phase II and subtracted the cost of developing and selling it.[11] The Bankruptcy Court found the likely sales price for the

---

[11] The Bankruptcy Court subjected these figures to adjustments to account for various items such as appreciation in value and to reduce the figures to net present value. No complaints have been made about the adjustments. The Court treats these in detail below but leaves them out here for simplicity's sake.

to-be-constructed Phase II project to be $48,341,084.75, adjusted for net present value.[12] *Id.* at 726. The project's net construction costs were projected to be $41,407,186.24. *Id.* at 726–27. Subtracting the two figures leaves a total of $6,933,898.51. This figure essentially represents the value of the Phase II land combined with the right to use the Phase I amenities.

The Bankruptcy Court excluded from its calculation of the net construction amount the cost of the Phase II land and any construction costs attributable to building the common elements. *Id.* at 725. The reasons for this are obvious. The common elements, for their part, were already built, and a Phase II buyer bought the right to use them simply by buying the Phase II land.

The Bankruptcy Court started its Phase II analysis by finding a market value for the land without access to the amenities of $3,745,027.00,[13] *Id.* at 721, drawing on the experts' testimony of the amount for which comparable tracts of land in the area had sold. Appellant conceded at

---

[12] The Bankruptcy Court's potential gross sales figure for the Phase II units was $61,008,000.00. *In re Diamond Beach*, 506 B.R. at 726. The Bankruptcy Court subtracted from this figure selling costs, applied a discount rate to bring the figure to present value, and applied an appreciation rate to account for the units' likely increase in value to get a hypothetical "total in net present value for gross sales of $48,341,084.75." *Id.* The Court treats these adjustments in greater detail below.

[13] To get this value, the Bankruptcy Court found that the useable acreage of Phase II was 2.8658 acres. *In re Diamond Beach*, 506 B.R. at 721. The Bankruptcy Court relied on the testimony of Robert Ellis, a land surveyor retained by the Bank who had conducted a boundary survey of Diamond Beach [Doc. No. 2-11 at 255–56] for the acreage of Phase II. [Ellis Boundary Survey, Pl.'s Ex. 106, Doc. No. 28-133]. Ellis identified the total acreage of Phase II as 2.8658 acres [Doc. No. 2-11 at 260]. Ellis' calculation, contrary to that of all the appraiser witnesses, excluded the land under the Lazy River from Phase II and included it in Phase I. [*Id.*]. Ellis left out of his calculation for Phase II's useable acreage, however, the 18,111 square feet of beach south of the vegetation line on the grounds that it was public beach. [*Id.* at 268, 278–80]. This reduced Ellis' figure for the useable acreage of Phase II to 2.45 acres. [*Id.* at 262]. The Bankruptcy Court, in contrast, included the land south of the vegetation line in its useable acreage calculation for Phase II on the grounds that, though it "[could] not be used for construction of additional condominiums," it was "unique" and its "value [wa]s . . . enhanced by its beachfront location." *In re Diamond Beach*, 506 B.R. at 721. The Bankruptcy Court multiplied its 2.8658 useable acres figure by $30.00 per square foot to arrive at the total value of the land. This is the same value per square foot which one of the experts for Davis attributed to the Phase II land. [Tr. Bankruptcy Ct. Hr'g 5/21/13, Doc. No. 2-7 at 38].

oral argument that the land value was reasonable.[14] As the Bankruptcy Court observed, the value of the Phase II land plus the right to use the shared amenities ($6,933,898.51) exceeds the market value of the Phase II land without access to the shared amenities ($3,745,027.00). *Id.* at 725. Thus, unsurprisingly, the Bankruptcy Court found that the right to use the shared amenities located on Phase I added value to the undeveloped Phase II. *Id.* The Bankruptcy Court used, consequently, the value of the Phase II land plus the right to use the amenities in calculating its value for Phase II, not the smaller market value of the land without the right to use the shared amenities. *Id.* at 725.

The Bankruptcy Court then added the value it calculated for Phase II—$6,933,898.51— to the value of the forty-one unsold Phase I condominium units—$14,600,000—to arrive at a total of $21,533,898.51.  The Bankruptcy Court subtracted this total from the agreed-to prepetition claim—which at the time of the judgment had been reduced to $27,578,592.89, by agreement of the parties—to get a deficiency judgment of $6,044,694.38. *Id.* at 727, 727 n.5.

### III.   The Dispute

The parties only dispute the value the Bankruptcy Court assigned to Phase II. Appellee claims that the Bankruptcy Court valued Phase II correctly. Appellant claims that it did not and that the value should be higher. The value of the land in Phase II is not in contention. The dispute centers on how much value the Phase II owners' right to use the common elements built on Phase I adds to the land value of Phase II.[15]  Appellee put the issue succinctly at oral argument

---

[14] Appellant stated that "[l]eaving the [shared] amenities aside, it's not difficult to assign a value to th[e] undeveloped [Phase II] land. And there's minimal disagreement over the value of the undeveloped land because it can be determined from comparable sales." [Doc. No. 30 at 12].

[15] As noted, Phase II's interest in the common elements built on Phase I could, if the cost of maintaining them were to exceed the benefit they brought to whatever was built on Phase II, constitute a liability for Phase II.

before this Court: "[w]hat we're fighting about is the [sic] how do you value a right to use somebody else's amenities." [Doc No. 30 at 33]. Appellant agreed, observing at oral argument that "the issue that we're here to talk about" is "what is the value of that Phase Two development including . . . value that's enhanced by the common amenities." *Id*. at 12.

### A.  Appellant's Position

Appellant argues that the Bankruptcy Court valued Phase II too low because it erred in its analysis in three ways. Appellant claims: 1) that the Bankruptcy Court's valuation violated Texas law; 2) that the Bankruptcy Court wrongly rejected the valuation methodology employed by the experts at trial; and 3) that the Bankruptcy Court did not base its valuation on the evidence at trial.

Appellant argues, first, that the Bankruptcy Court conducted its valuation inconsistent with Texas law. His Texas law argument has two prongs. In the first prong, Davis argues that Texas law permits only three methodologies to value property: the cost method, the comparable sales method, and the income method. Appellant claims the Bankruptcy Court employed none of these approaches and that Texas law requires the use of the cost method in circumstances such as those in the case at bar. In the second prong of his Texas law argument, Appellant argues that Texas law categorically bars the use of a valuation methodology known as the subdivision development method. Davis argues that the Bankruptcy Court committed error by employing the subdivision method to value Phase II.

Second, Appellant argues that the Bankruptcy Court wrongly rejected the valuation methodology the experts employed at trial—the cost approach—and substituted its own. Appellant argues the Bankruptcy Court was bound to follow the expert testimony in its choice of valuation methodology.

In a similar vein, Davis' third argument is that the Bankruptcy Court "did not base its valuation on the evidence at trial" and that it "significantly departed from the range of expert testimony offered at trial." Appellant claims it means the Bankruptcy Court did not base its opinion on the testimony of the experts and committed reversible error when it, allegedly, departed from the record. [Doc. No. 7 at 32]; [Doc. No. 15 at 5].

### B.  Appellee's Position

The Appellee contends that the Bankruptcy Court's valuation was correct. Alternatively, Appellee argues that if this Court finds the Bankruptcy Court's valuation was improper, it should calculate the deficiency judgment owed by Davis according to the amount the project sold for at the foreclosure sale. [Doc. No. 19 at 8]. Appellee argues that the Court can, instead of remanding to the Bankruptcy Court, reverse the Bankruptcy Court's ruling and adopt as the deficiency judgment the foreclosure value based on § 51.003 of the Texas Property Code. [Doc. No. 30 at 49]; [Doc. No. 19 at 8–9, 10]. This would put the deficiency at $9.8 or $9.9 million, according to Appellee—considerably more than the approximately $6 million deficiency that resulted per the Bankruptcy Court's valuation. [Doc. No. 30 at 49]. Not surprisingly, Davis disagrees with both of those propositions. Since the Court affirms the judgment of the Bankruptcy Court, it need not address the issue of whether the foreclosure price is an appropriate measure of fair market value.

### IV.    <u>Standard of Review</u>
### A.  Findings of Fact and Legal Conclusions

In the Fifth Circuit, legal conclusions receive *de novo* review, while findings of fact are reviewed for clear error. *In re San Patricio Cnty. Cmty. Action Agency*, 575 F.3d 553, 557 (5th Cir. 2009) (quoting *In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 583 (5th Cir. 2008)); *Matter of Texas Extrusion Corp.*, 844 F.2d 1142, 1156–57 (5th Cir. 1988); *Matter of Briscoe*

*Enterprises, Ltd.*, *II,* 994 F.2d 1160, 1163 (5th Cir. 1993) (citing *Matter of Bennett*, 970 F.2d 138, 139 (5th Cir. 1992)); *Matter of Delta Towers*, *Ltd.,* 924 F.2d 74, 76 (5th Cir. 1991) (quoting *In re Missionary Baptist Foundation, Inc.*, 712 F.2d 206, 209 (5th Cir. 1983) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948))); *Drive Fin. Servs., L.P. v. Jordan*, 521 F.3d 343, 346 (5th Cir. 2008) (citing Fed. R. Bankr. P. 8013).

### B. Clear Error Review

The Fifth Circuit has defined clear error review in the following ways. In *Matter of Delta Towers*, the Fifth Circuit held that "[f]indings of fact made by a bankruptcy court will not be set aside unless clearly erroneous" and that "[a reviewing] Court will reverse only when 'although there is evidence to support it, the reviewing court on the entire evidence is left with a firm and definite conviction that a mistake has been committed.'" *Matter of Delta Towers, Ltd.*, 924 F.2d at 76 (quoting *In re Missionary Baptist*, 712 F.2d at 209 (quoting *United States Gypsum*, 333 U.S. at 395))).

In *Good v. RMR Investments, Inc.*, the Fifth Circuit found that "[u]nder a clearly erroneous standard of review, the district court, sitting as an appellate court, must affirm the decision of the bankruptcy court if the bankruptcy court's account of the evidence is 'plausible in light of the record viewed as a whole.'" 428 B.R. 249, 253 (E.D. Tex. 2010) (citing *Jarvis Christian College v. Nat'l Union Fire Ins. Co.*, 197 F.3d 742, 746 (5th Cir.1999)). The *Good* Court stated that, "[i]n practice, the 'clearly erroneous' standard requires the appellate court to uphold any [lower] court determination that falls within a broad range of permissible conclusions." *Id.* (citing *Jarvis Christian College*, 197 F.3d at 746 (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 400 (1990))).

### C.  Mixed Questions of Law and Fact

The Fifth Circuit in *Missionary Baptist* refined the standard of review for mixed questions of law and fact: "[w]hen a finding of fact is premised on an improper legal standard, or a proper one improperly applied, that finding loses the insulation of the clearly erroneous rule." *Matter of Missionary Baptist*, 712 F.2d at 209 (citing *Smith v. Hightower*, 693 F.2d 359 (5th Cir. 1982)); *see also Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 602 n.4 (5th Cir. 1985) (finding that "[t]he 'clearly erroneous' rule does not apply . . . to determinations reached by application of an incorrect legal standard") (citing *Falcon Rice Mill, Inc. v. Community Rice Mill, Inc.*, 725 F.2d 336, 344 and n.7 (5th Cir. 1984); *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 384 (5th Cir. 1977); *Continental Motors Corp. v. Continental Aviation Corp.*, 375 F.2d 857, 859 (5th Cir. 1967)).

### D.  Valuation and Valuation Methodology

In the Fifth Circuit, "'[v]aluation [in the bankruptcy context] is a mixed question of law and fact, the factual premises being subject to review on a clearly erroneous standard, and the legal conclusion being subject to de novo review.'" *In re Stembridge*, 394 F.3d 383, 385 (5th Cir. 2004) (quoting *In re T-H New Orleans Ltd. Partnership*, 116 F.3d 790, 799 (5th Cir.1997) (citing *In re Clark Pipe & Supply Co., Inc.*, 893 F.2d 693, 69–98 (5th Cir. 1990))). "Although the district court [i]s bound to accept the bankruptcy judge's factual findings unless clearly erroneous, it 'must independently determine the ultimate legal conclusion adopted by the bankruptcy judge on the basis of the facts found.'" *Matter of Bufkin Bros., Inc.*, 757 F.2d 1573, 1577–78 (5th Cir. 1985) (quoting *Matter of Hammons*, 614 F.2d 399, 402–403 (5th Cir. 1980)).

14

### V.   Application of Texas Law

#### A.  Applying Texas Law or Federal Law to the Bankruptcy Court's Decision Leads to the Same Result

At oral argument, the parties disagreed on which law, Texas or federal, governed valuation of the project. [Doc. No. 30 at 5]. Appellant argued Texas law controlled, while Appellee contended that § 506 of the Federal Bankruptcy code controlled. *Id.* Both parties spend the majority of their briefs arguing as if Texas law governs the valuation.[16] The Court notes that the Bankruptcy Court did not address the issue of the applicable law governing choice of valuation methodology.   This Court finds, however, that the Bankruptcy Court's choice of valuation methodology was correct under either Texas or federal law, whichever law controls. As such, the Court need not decide between the two. The result would be the same regardless of the application of Texas or federal law.

#### B.  The Bankruptcy Court's Decision Did Not Violate Texas Law

Appellant claims that Texas law governed choice of valuation methodology. Assuming, hypothetically, that to be the case, the Bankruptcy Court would be bound to follow the decision of Texas' highest court on the issue. Davis claims that in *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177 (Tex. 2001), "[t]he Supreme Court [of Texas] explained why the subdivision development method is unacceptable under Texas law." [Doc. No. 7 at 25]. He further contends that the Bankruptcy Court employed the subdivision development method. Finally, Appellant claims that the holding in *Sharboneau* permits only three approaches to valuation: (1) the comparable sales approach, (2) the cost approach, and (3) the income

---

[16] The Court notes that the parties did execute a Construction Loan Agreement with a choice of law provision specifying that the contract was governed by Texas law.   [Construction Loan Agreement, Pl.'s Ex. 1, Doc. No. 28-1, Art. VIII § 8.15].

approach. Davis then narrows his argument, claiming that the holding in *Sharboneau* requires application of the cost approach in the circumstances of this case.

Appellant both misreads *Sharboneau* and misapplies it to the case at bar. *Sharboneau* does not categorically proscribe the "subdivision development method" of valuation. Rather, the Supreme Court in *Sharboneau* stated explicitly that it "agree[d] with" "courts . . . permit[ing] subdivision development method evidence when the particular analysis and the facts of the case demonstrate that the method can produce a useful estimate of market value." *Sharboneau*, 48 S.W.3d at 186. The Supreme Court *did* counsel against using the subdivision development method in cases of "raw, unimproved land in condemnation cases." *Id*. at 189–90. In *Sharboneau* the land was raw, unimproved, not zoned for development, and some distance from any meaningful development.  Phase II, on the other hand, is neither raw nor unimproved in the sense meant by the *Sharboneau* opinion. It is "ready-to-build," permits and all, and possesses the right to use the completed common elements on Phase I. Phase II has immediately next door a completed and over half sold (at the time of the bankruptcy filing) condominium project (Phase I). It has already available world-class amenities awaiting its owner. This is far different from *Sharboneau*'s open field, zoned as open field and far away from any comparable development project.[17] *Sharboneau* is inapplicable to the case at bar.

Further, the Bankruptcy Court did not use the subdivision development method to value Phase II.  The *Sharboneau* Court described the subdivision development valuation method as "estimat[ing] the land's gross value as if it were subdivided for residential development, then

---

[17] As the Supreme Court of Texas noted, the appraised land in *Sharboneau* was a mile and a half away from a tract of land in an industrial area, three miles away from a tract of land next to a residential area, and half a mile away from a tract of land being developed as a residential subdivision near an existing residential area. *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 181 (Tex. 2001).

discount[ing] this value for the estimated costs of development." *Id.* at 180. This is not the situation the Bankruptcy Court faced.  To the contrary, it had to value a tract of land that *was* zoned for residential development, had a completed development next door, *possessed* the requisite permits, and possessed, for its use, the already-built world-class common elements. The Bankruptcy Court described its method as a modified income approach. Assuming, hypothetically, that *Sharboneau* controlled the outcome of this case, it prohibits neither a subdivision approach nor an income approach.[18]

Additionally, *Sharboneau*'s holding does not restrict an expert's appraisal to the three approaches cited by Davis. The Supreme Court clearly left the door open to methods of valuation outside of these "three traditional approaches" when it wrote that "[the expert's] subdivision development analysis is a distinct method of appraisal that we must examine on its own merits." *Id.* at 184. The *Sharboneau* Court further observed that the touchstone for the validity of an appraisal method is not whether it falls within the three traditional approaches but whether it yields fair market value. The Supreme Court opined that "[n]o matter what appraisal method an expert uses . . . the goal of the inquiry is always to find the fair market value of the . . . property." *Id.* at 183.

Finally, of the three approaches cited by Davis, the Court in *Sharboneau* does not require the cost approach. The Court in *Sharboneau* stated that "[t]he cost approach, which looks to the cost of replacing the condemned property, is best suited for valuing improved property that is unique in character and not frequently exchanged on the marketplace." *Id.* at 183 (quoting *Religious of the Sacred Heart v. City of Houston*, 836 S.W.2d 606, 616 (Tex. 1992) (citing

---

[18] The Court in *Sharboneau*, as noted, described the income approach as one of "the three traditional approaches." *Sharboneau*, 48 S.W.3d at 183. This parallels what the Fifth Circuit has explained: that the income approach is a "standard appraisal method." *In re Pac. Lumber Co.*, 584 F.3d 229, 248 (5th Cir. 2009).

AMERICAN INSTITUTE OF REAL ESTATE APPRAISERS, *THE APPRAISAL OF REAL ESTATE* 62, 349 (9th ed. 1987))). Though the Court observed that the cost approach was "best suited" for unique improved property, it cautioned that "[a]n appraisal method is only valid if it produces an amount that a willing buyer would actually pay to a willing seller." *Id.* As detailed below, the Bankruptcy Court explained at length why, given the evidence at trial, the application of the cost approach in the case at hand would not "produce[] an amount that a willing buyer would actually pay to a willing seller." *Id.* Use of the cost approach in this case, the Bankruptcy Court found, would be an invalid methodology. This Court agrees.

The Court finds that the Bankruptcy Court's choice of valuation methodology did not violate Texas law.

The Court notes that Davis in his Reply claims that federal law sets forth the same requirements as Texas law: namely, that bankruptcy courts must follow one of the three classic approaches to determine fair market value and that federal law bars use of the subdivision development method for conducting valuations of fair market value pursuant to § 506. [Doc. No. 15 at 10–11]. Appellant cites no controlling authority for either of these two propositions. Appellant cites the following cases, all from outside the Fifth Circuit, in support*: In re Melgar Enterprises, Inc.*, 151 B.R. 34 (Bankr. E.D.N.Y. 1993); *In re Zersen*, 189 B.R. 732 (Bankr. W.D. Wis. 1995); and *In re Vallambrosa Holdings*, L.L.C., 411 B.R. 899 (Bankr. S.D. Ga. 2009). [*Id.*].

As it does with *Sharboneau*, Appellant misreads these three federal cases and misapplies them to the case at bar. The courts in both *Melgar* and *Vallambrosa* recognized the validity of the subdivision development method and indicated there are circumstances where it is appropriate. As noted, the Bankruptcy Court did not even use the subdivision method. On the topic of limiting acceptable appraisal methodologies to the cost, comparable sales, and income

18

approaches, the *Zersen* Court merely stated "there are three generally recognized appraisal techniques." *In re Zersen*, 189 B.R. at 738.  The *Zersen* Court, which approved a comparison sales approach, did not opine that any technique outside the three is improper in every circumstance.

The Court in *Vallambrosa* rejected the subdivision development method in wholly different circumstances from the case at bar. *Vallambrosa* was a case of an unstarted, unapproved development with many material, outstanding contingencies and without even a plan specifying the number and size of the lots envisioned. *In re Vallambrosa Holdings, L.L.C.*, 411 B.R. at 907–10. These facts are a far cry from the fully built Phase I and adjacent ready-to-build Phase II. The Court emphasized that courts are "not bound by the opinion of any expert and may accept or reject expert testimony in the exercise of sound judgment." *Id*. at 908.

The Court in *Melgar* rejected what it termed one party's "hybrid valuation." *In re Melgar Enterprises, Inc.*, 151 B.R. at 40. It did so, however, not based on the fact that the valuation stepped outside of the three traditional methodologies, but because the party proferring the valuation valued the land as it would be after development, not in its "current state" at the time of valuation. *Id*. at 41. The *Melgar* Court found that the land had to be valued in its "current state." *Id*. The current state in the case of Phase II is fee ownership of the land, but not the amenities.

As it does with *Sharboneau*, Appellant both misreads the three federal cases it cites and misapplies them to the case at bar. This Court need not decide whether Texas or federal law controls, as the methodology employed (as will be discussed below) complies with both.

**VI.**    **The Bankruptcy Court Did Not Utilize an Impermissible Methodology**

As stated, the major point of contention in this case remains the value of Phase II. Appraisers value unimproved land on a daily basis, but what makes this land somewhat problematic is that it carries with it the right to use the Phase I amenities. Appellant claims the Bankruptcy Court committed reversible error by rejecting the cost methodology and by substituting a different methodology in its place. While this can accurately be described as a complaint about methodology, the genesis of the issue is the fact that the owner of Phase II possesses the right to use the common elements but does not own them. Moreover, Phase II is burdened by the duty to pay its share of their upkeep.

**A. The Cost Approach is a Recognized Approach, But It is Not a Gold Standard**

The four experts called by the parties to testify as to the value of Phase II all used some form of the cost approach—calculating what would be the cost to reproduce the amenities.

The Bankruptcy Court was certainly not the first court to question the validity of the cost approach in certain circumstances. The Fifth Circuit has found that the cost approach can overstate value. In *United States v. Benning Hous. Corp.*, the Fifth Circuit observed that "reproduction cost evidence almost invariably tends to inflate valuation." 276 F.2d 248, 250 (5th Cir. 1960).[19] The Court in *Benning* rejected the use of the cost approach to value the building improvements on two 75-year leasehold estates because "reproduction cost of a structure sets an absolute ceiling on the market price of that structure, a ceiling which may not be, and most frequently is not, even approached in actual market negotiations." *Id.* The Fifth Circuit also

---

[19] *See also*, *Sharboneau* at 183 (wherein it states that the cost approach "tends to set the upper limit of true market value").

noted that the cost approach is to be used with caution. It observed that, due to its tendency to overstate value, "the justification for placing substantial safeguards upon [the] admission [of reproduction cost evidence] is apparent" and its admission required "some special showing." *Id.* The experts in this case did not make this special showing.

The fallacy of using the cost approach in this kind of situation was even recognized by one of those who used it. One of Appellant's experts could not even explain, when asked by the Bankruptcy Court, why he applied the cost approach. In the trial, the Bankruptcy Court asked Kim Kobriger if a purchaser of Phase II would actually pay the reproduction cost for the shared amenities; Kobriger answered, "I don't know." [Tr. Bankruptcy Ct. Hr'g 5/15/13, Doc. No. 2-13 at 131]. When asked why, then, he valued them using the full cost of their reproduction,[20] Kobriger answered, ". . . you're really hitting the fundamental question that I really didn't explore far enough . . . And I have no legitimate answer to your question. I know I thought about it and then for some reason I just decided that it's 100 percent cost and I'm going to attribute 50 percent."[21] [*Id.* at 132]. This falls far short of the "special showing" *Benning* required to justify admission of cost approach evidence.

---

[20] This Court realizes that some of the experts adjusted their calculations so as not to include the full reproduction cost of common elements essential to Phase I but of limited or no use to Phase II (like hallways and elevators in the Phase I building). One example of this situation is the cement structure housing the Phase I units but also supporting some of the shared amenities. Kobriger attributed only 20 percent of the cement structure to Phase II. [Tr. Bankruptcy Ct. Hr'g 5/15/13, Doc. No. 2-13 at 43]. Another example is the hallways inside of Phase I. [Tr. Bankruptcy Ct. Hr'g 5/14/13, Doc. No. 2-12 at 60]. Deal was the exception; he included items like the Phase I seventh floor hallways—something an owner of Phase II is unlikely to benefit from because they serve only individual Phase I units—in the common elements whose reproduction value he attributed to Phase II. [Doc. No. 2-7 at 131].

[21] Kobriger attributed the other 50 percent of the cost to recreate the common elements to Phase I.

### B. The Cost Approach is Only Used When It Would Make Reasonable Business Sense to Reproduce the Asset Being Valued

As alluded to above, it would make no business sense for any buyer of Phase II to reproduce Phase I's amenities on its property. First of all, Phase II already has the right to use the Phase I amenities so it would be illogical to replicate them. Secondly, the Lazy River covers the very land a Phase II owner would need to make such a reproduction. Without more property it would be practically impossible.

The United States Supreme Court itself has recognized this very concept. In *United States v. Toronto, Hamilton & Buffalo Nav. Co.*, the Supreme Court rejected application of the cost approach in circumstances "whe[re] no one would think of reproducing the property." 338 U.S. 396, 403 (1949). No buyer of Phase II would think of reproducing the common elements that already sit at its front door. The *Toronto* Court also confronted head-on the problem of valuation where, as in the case at bar, there was "'no market' for the property in question." *Id*. at 402. The Court observed that where there was no market, the only "means of measuring value" that "ha[d] relevance" were those that "b[ore] on what a prospective purchaser would have paid." *Id*. The *Toronto* Court rejected the cost approach as not "bear[ing] on what a prospective purchaser would have paid," writing that "[o]riginal cost is well termed the 'false standard of the past' where, as here, present market value in no way reflects that cost." *Id*. at 403.

In *Whitehouse Hotel Ltd. P'ship v. C.I.R.*, the Fifth Circuit rejected a valuation based on the cost approach where it was being used to value something that no one would ever reproduce. 755 F.3d 236, 245 (5th Cir. 2014). The Fifth Circuit upheld a tax court's rejection of the cost approach to value a conservation easement. *Id*. The *Whitehouse Hotel* Court observed that the tax court was correct in holding that it "[could] not [be] show[n] that it would be a reasonable

22

business venture to reproduce" the property and hence the cost approach was inappropriate. *Id*. at 245 (quoting *Whitehouse Hotel Ltd. P'ship v. Comm'r*, 139 T.C. 304, 316).

In an earlier appeal centering on the same tax court's valuation, the *Whitehouse Hotel* Court noted the tax court's "rul[ing] [that] the replacement-cost method is of little use when reproduction of the property is unlikely," when it remanded the case for further proceedings. *Whitehouse Hotel Ltd. P'ship v. Comm'r*, 615 F.3d 321, 334 (5th Cir. 2010) (quoting *Whitehouse Hotel Ltd. P'ship v. C.I.R.*, 131 T.C. 112, 147 (2008), vacated, 615 F.3d 321 (5th Cir. 2010)). In the subsequent appeal, the Fifth Circuit described its earlier action as "declin[ing] to state whether the tax court's . . . rejection of the . . . cost . . . method[] was error." *Whitehouse Hotel Ltd. P'ship v. C.I.R.*, 755 F.3d at 244. Also in the subsequent appeal, which upheld the tax court's decision after remand, the Fifth Circuit observed that it "did not find error in any considerations the tax court expressed when it addressed the experts' valuation method choices in its [prior] decision. On remand, the tax court [, like it had before the first appeal, refused to adopt] the reproduction cost approach because reproducing . . . [the property] would make no business sense." *Id*. Thus, the Fifth Circuit reviewed this issue twice and ultimately found no error when the same tax court rejected the cost approach where it would make no sense to reproduce the property in question.

In the case at hand, the Bankruptcy Court found it would be absurd for a Phase II buyer to pay the cost to reproduce amenities that: 1) are already there and 2) it would not even own. The Bankruptcy Court made a finding that "a buyer can use the amenities, no matter how elaborate," and posed the question of why a buyer would pay for the amenities the amount they cost to build anew. *In re Diamond Beach*, 506 B.R. at 725.  The evidence clearly supports the Bankruptcy Court's finding.

### C. The Cost Approach is an Inappropriate Way to Value Non-Fee-Simple Ownership Interests

This Court finds the controlling case law does not mandate that the cost approach be used to value something other than a fee simple property interest—e.g., land plus amenities that Phase II has the right to use, but does not own. The point bears emphasis. Why would anyone, in the case at hand, pay replacement cost for the common elements when they would be buying only the right to use but not to own them? No reasonable buyer would pay to reproduce property it was not going to own.

Moreover, the Fifth Circuit, in *Benning*, explicitly limited the relevance of the cost approach to valuing fee simple ownership interests. *United States v. Benning Housing Corp.*, 276 F.2d at 250. The Court in that case observed that there was "substantial, if not complete, unanimity" that one of the "factors governing the admission of reproduction cost evidence" was "that the interest [being valued] must be one of complete ownership." *Id.* Complete ownership of the common elements is not what a buyer of Phase II is going to get—it will only get a right to use (and pay maintenance for) the common elements. *Benning*, further, charged the trial court with the "primary responsibility" for deciding whether, "[w]here market value is not established," "reproduction cost should be admitted as an aid to valuation" at all. *Id.* at 251. *Benning*, as noted, pointed out the risks associated with the cost approach's tendency to grossly inflate value.

In a footnote, the Court in *Benning* cited *Messer v. United States*, 157 F.2d 793 (5th Cir. 1946) for the proposition that "reproduction cost is related to the value of the whole, if, indeed, it is related to value at all." *United States v. Benning Hous. Corp.*, 276 F.2d at 254 n.9. In *Messer*,

the Fifth Circuit rejected the cost approach to value a house and improvements a licensee had constructed on land that was subsequently condemned and taken in fee simple. The *Messer* Court found that "[a] willing buyer of [the] house would not pay as much for the house and other improvements subject as they were to an obligation for removal as a willing buyer would pay for the house and other improvements not subject to this obligation." *Messer v. United States*, 157 F.2d at 795. The concept that "a willing buyer would not pay as much for [the] property subject to the obligation as for [the] property not subject to the obligation" parallels the case at bar. *Id*. In this case, a willing buyer would not pay as much to use the common elements as it would to actually own the common elements. This is especially true since the right to use also carries the duty to pay for their upkeep.[22]

Finally, the Court observes that even the Appraisal Institute,[23] the appraisal organization to which all four experts in the instant case belong,[24] limits the cost approach's applicability to cases of fee ownership. [Tr. Bankruptcy Ct. Hr'g 5/21/13, Doc. No. 2-7 at 8, 167]; [Tr. Bankruptcy Ct. Hr'g 5/14/13, Doc. No. 2-12 at 7]; [Doc. No. 2-13 at 5]. According to the

---

[22] This Court notes that other courts in the Fifth Circuit have not rejected the cost approach in all circumstances. Several have validated expert testimony based on the cost approach. Importantly, in each of these cases, the property being valued was actually owned. See *In re Grind Coffee & Nosh, LLC*, No. 11-50011-KMS, 2011 WL 1301357, at *8 (Bankr. S.D. Miss. Apr. 4, 2011); *In re Fairchild Aircraft Corp.*, 124 B.R. 488, 498–99 (Bankr. W.D. Tex. 1991); *Universal Drilling Co. v. United States*, 412 F. Supp. 1231, 1238 (E.D. La. 1976); *Wal-Mart Stores, Inc. v. Qore, Inc.*, No. 1:06CV326, 2009 WL 224908, at *3–4 (N.D. Miss. Jan. 28, 2009).

[23] For the avoidance of confusion, the Court notes that the Appraisal Institute and the American Institute of Real Estate Appraisers are the same organization. According to the Appraisal Institute's website, the Appraisal Institute "was established when the American Institute of Real Estate Appraisers (AIREA) and the Society of Real Estate Appraisers (Society) unified in January 1991." THE APPRAISAL INSTITUTE, http://www.appraisalinstitute.org/about/our-history/ (last visited April 21, 2016).

[24] Mathew Deal is an associate member of the Appraisal Institute; Ronald Little holds the Appraisal Institute's MAI designation; Stephen Duplantis holds the Appraisal Institute's MAI designation and is both an approved instructor for the Appraisal Institute and the former president of its local chapter; and Kim Kobriger holds the Appraisal Institute's MAI designation. [Doc. No. 2-7 at 8, 167]; [Doc. No. 2-12 at 7]; [Doc. No. 2-13 at 5].

Appraisal Institute's publication *The Appraisal of Real Estate*, "the cost approach results in an indication of the value of the fee simple interest in a property." THE APPRAISAL INSTITUTE, *THE APPRAISAL OF REAL ESTATE* 384 (13th ed. 2001). *The Appraisal of Real Estate* states that "[i]f the purpose of the appraisal is to estimate the value of an interest other than fee simple, an adjustment may be required."[25] *Id*. at 378. An example of such an interest is a "fee encumbered by a long term lease." *Id*. One author has even described the cost approach as being "in a fight for its life," a "simplistic 'sticks and bricks' approach to the complex world of urban (spatial) economics." Woodward S. Hanson, *Fair Market Value: the Cost Approach in Eminent Domain and Land Valuation Litigation*, SG059 ALI-ABA 103, 105 (2002). While some of the experts did adjust the value they attributed to the common elements, none adjusted it to reflect Phase II's right to merely use them.

The Bankruptcy Court in the unusual circumstances of this case—where a buyer of Phase II would not even be getting ownership of the common elements—properly exercised its discretion by not basing its valuation on the cost approach evidence proffered by the experts.

### D. The Cost Approach Assumes a Reasonable Business Venture, Which Assumes a Viable Marketplace

In addition to problems of lack of fee ownership and the fact that it would not make sense for a business owner to reproduce the amenities, the Bankruptcy Court rejected the application of the cost approach based upon its findings that the Galveston real estate market was not a

---

[25] This topic overlaps with Appellant's Texas law argument. It is the 9th edition of *The Appraisal of Real Estate* to which *Sharboneau*'s discussion of the cost methodology is ultimately traceable. *Sharboneau* quotes *Religious of the Sacred Heart v. City of Houston*, 836 S.W.2d 606, 616 (Tex.1992) for that case's discussion of where the cost approach is best suited. *Religious of the Sacred Heart* cites *The Appraisal of Real Estate* as its sole authority for what *Sharboneau* quotes. THE APPRAISAL INSTITUTE, *THE APPRAISAL OF REAL ESTATE* 62, 349 (9th ed.1987).

competitive market and that Diamond Beach was a failed project. The facts are practically indisputable. The Bankruptcy Court explained its rejection of the cost approach as follows:

> In a competitive environment, cost is a proxy for value. In a non-competitive environment, using cost as a proxy for value may produce irrational results. In the absence of production, cost does not equate with value. If a producer will only produce at a price above $4.00, and a buyer will only buy at a price below $4.00, then cost does not equal value.

*In re Diamond Beach*, 506 B.R. at 724.

The Bankruptcy Court went on to observe, "in a failed project (Phase One having lost millions of dollars) cost is the antithesis of a proxy of value . . . If cost were the proper measure of value, Phase One would have sold for its cost rather than losing millions of dollars." *Id*. at 724–25. From this, the Bankruptcy Court concluded that:

> By using the cost of Phase One amenities as a proxy of the value to Phase Two, all of the appraisers fell into the same logical error. Buyers may enjoy the amenities, no matter how elaborate. The issue for value is whether the buyers will pay a sufficient premium for the units to justify paying as much for the amenities as they cost.

*Id*. at 725.

The Bankruptcy Court determined that buyers of Phase II would not pay the amount expected to reproduce the amenities on Phase I, based on the fact of the non-competitive market and the fact that buyers did not pay these amounts for Phase I after it went on that market. Clearly Phase I was not competitive in the marketplace as it existed, notwithstanding its elaborate amenities. There was no convincing evidence to suggest that Phase II in a damaged marketplace would fare better. Accordingly, the Bankruptcy Court rejected use of the cost methodology and the experts' valuations based upon it. The United States Supreme Court has emphasized the importance of market health to the valuation of real estate, over and above retrospective valuations by experts that disregard a damaged market. In *City of New York v.*

*Sage*, the Supreme Court found that "what the owner is entitled to is the value of the property . . . and that means what it fairly may be believed that a purchaser in fair market conditions would have given for it in fact,-not [sic] what a tribunal at a later date may think a purchaser would have been wise to give." 239 U.S. 57, 61 (1915).[26]

### E.  What the Bankruptcy Court Did

Instead of applying the cost approach, the Bankruptcy Court applied what it described as a "modified income approach" "[t]o determine the value of the land plus the amenities in a to-be-built Phase Two." *In re Diamond Beach*, 506 B.R. at 725. To do so, the Bankruptcy Court "first determined the likely sales price of the to-be-constructed units in Phase Two." *Id*. The Bankruptcy Court "then determined the forecast cost of building, financing and marketing Phase Two, without the elaborate amenities package." *Id*. It subtracted the forecast cost of developing and selling Phase II from the likely sales price for a to-be-built Phase II to get "the combined value of the land and amenities." *Id*.

The purpose of the valuation was to find the fair market value for the Phase II land, which included a right to use common elements owned by Phase I. The experts' testimony left the Bankruptcy Court with valuations reached by the cost methodology, which assumed ownership. The experts did this despite the fact that the Fifth Circuit (reinforced by the Appraisal Institute on the complete ownership point) has explained that the cost approach is inappropriate absent complete ownership and a reasonable business reason to duplicate the asset. The Bankruptcy Court thus had no legitimate option other than to reject the experts' choice of

---

[26] The Supreme Court of Texas might add a fourth reason not to use the cost approach in this case because it specified in *Sharboneau* that the cost approach is "best suited for valuing improved property . . . ." *Sharboneau*, 48 S.W.3d at 183. An argument could be made that Phase II is not improved, at least not in the classic sense meant by that Court.

valuation methodology in calculating the market value of Phase II. As the Fifth Circuit explained in one case where an interest other than fee ownership was being valued, "[t]he admission of reproduction cost evidence, though perhaps making it easier to reach some solution, only ma[kes] the proper solution more difficult." *United States v. Benning Hous. Corp.*, 276 F.2d at 253.

While this Court might not have labeled the methodology used by the Bankruptcy Court as a modified income approach, it is clear that an income approach or one modified to fit a particular set of circumstances has been recognized in this Circuit. The Fifth Circuit has described the "income approach [as] assign[ing] value based on determining how much money an owner will derive from the business in the future, *Caracci v. C.I.R.*, 456 F.3d 444, 451 (5th Cir. 2006), and also as "call[ing] for projecting future income and discounting it to present value." *Kahl v. Castleman*, 106 F.3d 396, 1997 WL 33352, at *6 (5th Cir. 1997). The Fifth Circuit has explained that the "use of the income method . . . is not *a priori* unacceptable for any valuation purpose." *Whitehouse Hotel Ltd. P'ship v. C.I.R.*, 755 F.3d at 247. The Court noted in *Whitehouse* that ". . . there is little precedent discussing when the use of the income approach is appropriate." *Id*. at 246. The Fifth Circuit has even recognized its use in some rather unexpected fact situations. It provided a striking, if not tragic, example of this in *Rewis v. United States*, 536 F.2d 594 (5th Cir. 1976). In that case, the Fifth Circuit used an income approach to value the loss, to her mother, of a 15-month old child's services through the age of 17—clearly including income streams that did not yet exist at the time of the child's death. *Id*. at 595, 597.

### F. Bankruptcy Courts Possess Few Constraints on Their Choice of Valuation Methodology

Bankruptcy courts are not bound to follow an expert's choice of methodology, particularly where that choice is not supported by the evidence. In the Fifth Circuit, a court conducting a valuation has broad leeway in its approach and is not tied to any particular methodology. "The Bankruptcy Code does not prescribe any particular method of valuing collateral, but instead leaves valuation questions to judges on a case-by-case basis." *T-H New Orleans*, 116 F.3d at 799. "Value under § 506 [of the Bankruptcy Code] is to be determined in light of the purpose of the valuation and of the proposed disposition or use of the property." *Id*. at 799 (citing *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 964 (1997); *In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346 (5th Cir. 1989)). The Bankruptcy Court in this case justifiably exercised this discretion.

This Court did not find a Fifth Circuit case that precisely discussed a bankruptcy court that partially rejected the proffered methodology used by the testifying experts but then determined a value relying on a combination of their conclusions. It is clear that where the Board of Tax Appeals values a business for determining its tax liability, "[t]he [Tax] Board [i]s not obliged to accept . . . as sound the opinions of [the] experts." *Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 295 (1938). There is also Fifth Circuit authority under the Longshore and Harbor Workers' Compensation Act observing that an administrative judge "can accept any part of an expert's testimony; he may reject it completely." *Avondale Shipyards, Inc. v. Kennel*, 914 F.2d 88, 91 (5th Cir. 1990). "Where the testimony of medical experts is at issue, the ALJ [Administrative Law Judge] is entitled to accept any part of an expert's testimony or reject it

completely." *Mendoza v. Marine Pers. Co.*, 46 F.3d 498, 501 (5th Cir. 1995) (quoting *Kennel*, 914 F.2d at 91).

Many cases outside the Fifth Circuit support the broad discretion that bankruptcy court judges have in arriving at valuations independent of any one expert's opinion.[27] In the recent D.C. District Court case *Alberts v. HCA*, the court stated that "[t]he role of a bankruptcy court judge is not simply to pick which expert the judge likes most and then credit that expert's testimony fully. He may decide to credit or discredit, in whole or in part, the testimony of any expert witness, and decide the case on the evidence." *Alberts v. HCA, Inc.*, 496 B.R. 1, 18 (D.D.C. 2013). The Court in *Alberts* further observed that "[b]ankruptcy judges, acting as factfinders, are free to credit or disregard portions of expert testimony without subjecting those decisions to *de novo* review." *Id.* at 13 (citing *In re Exide Tech.*, 303 B.R. 48 (Bankr. D.Del. 2003)). "[D]isregard[ing] expert testimony that [the bankruptcy court judge] d[oes] not find

---

[27] Some commentators have criticized the practice of winnowing expert testimony to arrive at valuations independent of any one expert's opinion. They have referred to it as "meta-analysis" and "the search and select method," characterizing it as "undisciplined" and "inconsistent with the American adversarial system." *See* Stan Bernstein et al., *Squaring Bankruptcy Valuation Practice with Daubert Demands* (hereinafter, "Bernstein, *Squaring*"), 16 AM. BANKR. INST. L. REV. 161 (2008) (leveling various criticisms of the "search and select method"). One law review article describes the bankruptcy valuation process as follows: "The trier of fact may in the end agree with one side or the other, but could just as easily settle upon a third value of its own choosing. The valuation inquiry is thus inherently imprecise, a discretionary exercise that depends largely on the whims and predispositions of the factfinder." Keith Sharfman, *Judicial Valuation Behavior: Some Evidence from Bankruptcy*, 32 FLA. ST. U. L. REV. 387, 387–88 (2005). Even the commentators who caution against using the so-called "search and select method" allow that "there are situations where it is both reliable and appropriate to adopt various parts of the opinions of competing experts"  and concede that "the judicial roles of determining valuation and acting as an evidentiary gatekeeper [for admitting expert testimony] may overlap." *See* Stan Bernstein et al., *The Empowerment of Bankruptcy Courts in Addressing Financial Expert Testimony*, 80 AM. BANKR. L.J. 377, 430 (2006) (acknowledging the search and select method is appropriate in some circumstances); Bernstein, *Squaring*, *supra* (observing the overlap of courts' role as determiner of valuation and evidentiary gate keeper).

supported by the record . . . [is] acting within his role as fact-finder, not usurping the role of expert witness." *Id.* at 17. This Court agrees.

Other bankruptcy courts have engaged in or approved the practice used here by the Bankruptcy Court. In *In Re Grind Coffee & Nosh*, a 2011 decision by the United States Bankruptcy Court for the Southern District of Mississippi, the Court held that "[a] bankruptcy court is not bound by valuation opinions or reports submitted by appraisers, and may form its own opinion as to the value of property in bankruptcy proceedings." *In re Grind Coffee & Nosh, LLC*, No. 11-50011-KMS, 2011 WL 1301357, at *6 (Bankr. S.D. Miss. Apr. 4, 2011) (citing *Patterson v. LJR Invs., LLC* (*In re Patterson*), 375 B.R. 135, 144 (Bankr. E.D. Pa.2007); *In re Barbieri*, No. 00–22274–478, 2009 WL 5216963, at *10 (Bankr. E.D. N.Y. Dec. 29, 2009); *In re Smith*, 267 B.R. 568, 572–74 (Bankr. S.D. Ohio 2001)). "The Court may accept an appraisal in its entirety or may choose to give weight only to those portions of an appraisal that assist the Court in its determination." *Id.* at *6 (citing *In re Brown*, 289 B.R. 235, 238 (Bankr. M.D. Fla.2003)). "[W]hen competing appraisals are submitted, the court is required to consider portions of each to arrive at what it believes to be a realistic market value for the property." *Id.* at 6 (quoting *In re Belmont Realty Corp.*, 113 B.R. 118, 121 (Bankr. D.R.I. 1990)).

The purpose of the valuation in this case was to determine how much a buyer would pay for Phase II's land and the right to use, but not own, an elaborate set of entertainment facilities. This hypothetical benefit, however, also carries a potential liability with it, as an owner of Phase II would also be liable for a percentage of the upkeep of the common amenities. As explained above, a bankruptcy court is free to reject experts' valuation methodology where it does not suit the purpose of the valuation. As also explained above, the cost approach is inappropriate to value interests short of complete ownership, assets that are not likely to be reproduced, and assets that

exist in the context of a non-competitive market. All of these factors exist in the case. Thus, the Bankruptcy Court was justified in rejecting the cost approach and relying on a suitable alternative approach to value Phase II's right to use but not own the common elements. The Bankruptcy Court did not err in choosing the valuation method it utilized.

### VII.    The Bankruptcy Court's Decision Was Supported by the Record

Davis' claim that the Bankruptcy Court rejected all of the expert testimony when it declined to apply the cost approach is incorrect. To the contrary, the Bankruptcy Court's entire opinion rests upon the many facts delineated by various experts and other witnesses. In fact, the Bankruptcy Court declined to apply the cost approach precisely because of the testimony the experts offered at trial. That testimony demonstrated that the Galveston real estate market was not a competitive market. The Bankruptcy Court also based its rejection of the cost approach on its own finding that Diamond Beach was a failed project. This, of course, is self-evident given that the project is in bankruptcy.

The Bankruptcy Court's finding that the Galveston real estate market was not competitive finds ample support in the record. For example, the Bankruptcy Court's statement that "the Galveston real estate market has not reached a level of growth to support the development of 120 to 123 additional Class A condominium units" is drawn directly from the testimony of Davis' experts Mathew Deal and Kobriger. *In re Diamond Beach*, 506 B.R. at 720. Deal stated that there have been no new class A condominium developments since his "research beginning in 2009," [Doc. No. 2-7 at 100–01], and that in June 2012 there were no Class A condominium developments and no financing for Class A developments. [*Id*. at 118]. Kobriger's testimony stated that he looked at the market and determined that there was an oversupply of condominium

units in the marketplace. [Doc. No. 2-13 at 30]. As a result, he concluded that "premium condominiums would not be feasible . . . in the second phase [i.e., Phase II] of the project." *Id*.

The Court concludes that the evidence at trial supports the Bankruptcy Court's analysis and conclusions concerning the market.

The Court notes that it has reviewed all of the figures the Bankruptcy Court used to achieve a Phase II valuation. Every one of these figures comes directly from the record. They include such things, among many others, as the price per square foot value of Phase II, Phase II's total saleable area, and the Phase II construction costs, all of which were extrapolated from the experts' estimates of the construction costs.

The Bankruptcy Court found gross sales for the to-be-constructed Phase II units to be $61,008,000. *In re Diamond Beach*, 506 B.R. at 726. This assumed a total saleable building area of 157,440 square feet and a price per square foot of $387.50 for the to-be-built Phase II units. *Id*. Both figures are drawn directly from the record, specifically Ronald Little and Davis' testimony. [Tr. Bankruptcy Ct. Hr'g 5/23/13, Doc. No. 2-8 at 144, 146]; [Doc. No. 2-8 at 168]. The Bankruptcy Court noted that the price per square foot represents the midpoint of the range provided by Davis himself but is greater than the average provided by the experts for the sale of the remaining units in Phase I. *In re Diamond Beach*, 506 B.R. at 725–26. The Court arrived at its total saleable building area by multiplying the total number of anticipated Phase II units (123) by the average size of each Phase II unit (1,280 square feet). *Id*. Both of these figures are again drawn directly from the record. [Doc. No. 2-8 at 144, 146].

From the gross sales figure ($61,008,000), the Bankruptcy Court then subtracted 15.00% in selling costs (to arrive at $51,856,800.00), added 10.00% value appreciation (to arrive at $57,042,480.00), applied a discount rate of 18.00% over a one year period, and arrived at a

figure of $48,341,084.75 for net present value for gross sales for the to-be-constructed Phase II. *In re Diamond Beach*, 506 B.R. at 726–27. The last two percentages are drawn directly from the record; the first is based on the Phase I figures from Deal's report. [Doc. No. 29-12 at 16]; [Doc. No. 2-8 at 135]; [Doc. No. 2-12 at 62]. No complaints have been made concerning the selling costs or about the Bankruptcy Court's arithmetic. The Bankruptcy Court then deducted from the net present value for gross sales figure for Phase II the cost to build the Phase II units. It arrived at $44,084,249.74 in total construction costs brought to current value. *In re Diamond Beach*, 506 B.R. at 726–27. This figure was again based on appraisal evidence in the record. It was derived from appraisal evidence estimating the construction costs to build Phase I, with the difference that it did not include "all costs already expended on the amenities on Phase One." *Id*. at 725. Obviously the amenities already exist, so including these costs would be superfluous.

The Bankruptcy Court then subtracted from the Phase II total construction costs brought to current value figure ($44,084,249.74) the following sums, which were derived from Little's testimony: construction interest ($1,452,476.50), engineering costs ($724,587.00), and $500,000.00 in marketing costs. This resulted in net construction costs for Phase II of $41,407,186.24. Subtracting the two figures above—$41,407,186.24 (the net construction costs) from $48,341,084.75 (the total in net present value for gross sales)—the Bankruptcy Court arrived at net proceeds of $6,933,898.51 for the Phase II land and amenities. *Id*. at 726–27. Added to the value the Bankruptcy Court found for the forty-one unsold Phase I condominiums—$14,600,000—this brought the total value of Phase II and the unsold Phase I units to $21,533,898.51. *Id*. at 727.

As a final matter the Court observes that, while rejecting their choices of methodology to value Phase II, the Bankruptcy Court's valuation of Phase II plus the unsold Phase I units falls

within the valuation range offered by the expert witnesses at trial. On the low end, Appellee's expert, Stephen Duplantis, valued Phase II plus the unsold Phase I units at $21,330,000, [*Id*. at 707, 713]; [Nov. 2012 Report of Stephen Duplantis, Pl.'s Ex. 33, Doc. No. 28-34 at 8], while, at the high end, Appellant's expert Mathew Deal valued the same at $29,320,000. *In re Diamond Beach*, 506 B.R. at 710. The Bankruptcy Court valued Phase II plus the unsold Phase I units at $21,533,898.51, well within the range given by the testifying experts. *Id*. at 727. This Court emphasizes that it is the total, combined value of Phase II and the unsold Phase I units that is of practical importance here. It is the difference between that total and IBC's prepetition claim of $27,578,592.89 that is needed to determine how much Davis owes the Bank.

### VIII.   Conclusion

This Court affirms the Bankruptcy Court's judgment. Valuation is a mixed question of law and fact. Factual findings are subject to clear error review and legal conclusions to *de novo* review. This dispute centers on how the Bankruptcy Court valued Phase II's right to use the common elements, located on Phase I. The Bankruptcy Court valued this right to use differently from the experts but used portions of their testimony and the record as a whole to arrive at its valuation.[28] This Court has reviewed the Bankruptcy Court's findings of fact and found they are clearly supported by the record. Therefore, the Bankruptcy Court committed no clear error in making its factual findings.

---

[28] The Court notes the parallel with what the Fifth Circuit Pattern Jury Instructions advise on expert witnesses. These state: "When knowledge of technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field is permitted to state his or her opinion on those technical matters. However, you are not required to accept that opinion. As with any other witness, it is up to you to decide whether to rely on it." Committee on Pattern Jury Instructions, District Judges Association, Fifth Circuit, PATTERN JURY INSTRUCTIONS (CIVIL CASES) 5 (2014) (emphasis added). If a jury as factfinder is not required to accept expert testimony, this Court cannot imagine a Court as factfinder is not accorded the same leeway.

This Court has reviewed *de novo* the Bankruptcy Court's legal conclusions. It finds no error here, either. As this Court has explained, the Bankruptcy Court's reasons for rejecting the cost methodology come directly from the record. In fact, in response to questions at trial at least one of the experts realized his own use of the cost methodology was questionable. The Bankruptcy Court in following the path it took was not without authority to do so. Indeed, the Fifth Circuit has stated the cost approach is inappropriate to value property absent complete ownership. Both the Fifth Circuit and the United States Supreme Court have stated the cost approach is inappropriate where reproduction of the asset being valued is unlikely. Both the Supreme Court of Texas and the Fifth Circuit have indicated that the ultimate goal of any valuation inquiry, regardless of method, is to find fair market value. This is just what the Bankruptcy Court did in this case. The methodology the Bankruptcy Court followed was designed to accurately evaluate the assets in question under the applicable circumstances, and the Court finds no error in that decision. The Bankruptcy Court's judgment is supported by and in harmony with both Texas and federal case law, and it was a lawful exercise of the discretion given to a bankruptcy court by the Bankruptcy Code.

The judgment of the Bankruptcy Court is affirmed.

Signed this 29th day of April, 2016.

Andrew S. Hanen

United States District Judge